UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CASE NUMBER: 04 11753 JLT

| | |
|---|---|
| ONE BEACON AMERICA INSURANCE COMPANY,<br>Plaintiff, | )<br>)<br>)<br>) |
| v. | )<br>) |
| BLUE WATER ENTERPRISES, INC.,<br>Defendant. | )<br>)<br>) |

## ANSWER

### PARTIES

1. Admit.

2. Admit.

3. Admit.

4. Admit.

5. Defendant responds that insurance contract speaks for itself.

6. Admit.

7. Deny.

8. Deny.

9. Admit.

10. Deny.

11. Deny, admit copy of correspondence and deny remainder of claims.

12. Admit copy of correspondence and deny remainder of claims.

13. Admit filing suit, deny remainder.

14. Deny.

15. Deny.

## JURISDICTION

16. Deny.

17. Deny.

## COUNT I
### (Appointment of Umpire)

18. Defendant repeats and reasserts each of the answers contained within Paragraphs 1 through 17 above as if each were set forth fully herein.

19. Defendant states the entire insurance contract speaks for itself.

20. Defendant states the entire insurance contract speaks for itself.

21. Admit.

In further answer, the Plaintiff acknowledges that on September 1, 2002 it received the completed Owner's Statement of Loss advising the Plaintiff that the owner would be pursuing a claim under his policy and that an estimate of repair would be forthcoming. From the date of loss of August 24, 2002, until April 10, 2003, a period of **nine months**, the Plaintiff took **no action** to investigate the incident or the vessel's damages. The Plaintiff contacted its "agent", but no one contacted the Defendant. The Plaintiff did not assign a surveyor to promptly contact the Defendant and assess the Defendant's damages. The Defendant immediately after the loss hired a surveyor to assess the vessel who determined that the vessel was a total loss. See attached Exhibit 1. On April 10, 2003, via facsimile to Defendant's counsel, the insurance adjustor, Bernice M. Ford, acknowledged that they were provided with prompt notice of the claim, yet

states that "Despite numerous requests they were never provided with any information regarding the extent of the damages". The record reflects no such request was made of the Defendant. Despite knowledge of his contact information, the Plaintiff failed to act promptly or within a reasonable time to contact the Defendant upon the Defendant's claim arising under the insurance policy. The Plaintiff waited <u>nine months</u> until the start of the following year's fishing season to acknowledge this claim and to indicate it would contact the Defendant's counsel's office to arrange a damage survey. From August 24, 2002, the Plaintiff took no actions under its policy of insurance to proceed against the responsible party, and the Defendant was therefore required to file suit in June of 2003 against the individual who caused this accident. The Plaintiff states, "After notification of the loss, the Defendant appointed David Wiggins as its surveyor to evaluate the nature and extent of the damage sustained to the F/V (for fishing vessel), Prim Lady". The statement is clearly calculated to mislead this Court as to the issue of timeliness. The Defendant's Agent, David R. Wiggin, indicates that on April 23, 2003, nine months after the loss, a preliminary survey took place, and the opinion of Mr. Wiggin is set forth in a letter dated May 10, 2003, <u>Exhibit 2</u>, this is well into the 2003 fishing season. After receiving the Defendant's position on the survey and the passage of one year and two months after the loss, on October 20, 2003 the Plaintiff requested a "Joint Survey". The Plaintiff allowed Mr. Galgana's damages to continue, as it had no responsibility for lost income under its policy. Regardless of the vessel damages at this point and whether the parties agreed, the Plaintiff to this date has still failed to pay for the loss of the tackle on the vessel as a result of the impact. The insurance contract cited by the Plaintiff and

attached to Plaintiff's complaint does not require or impose an obligation for a "Joint Survey".

The Defendant was required to file suit against the responsible party, due to the Plaintiff's failure to take any action against that party or under the terms and conditions of its insurance contract. It was after the correspondence in April and May, 2003 that caused the Defendant to determine that the Plaintiff's actions after timely notification of the loss reflected a violation of Chapter 176D, Section 3 and 9. It was clear the Plaintiff failed to properly investigate Defendant's claim, failed to file any claim for subrogation, failed to pay the claim or deny coverage of the claim and required the Defendant to institute litigation to recover amounts due under the policy. The Plaintiff blindly states that the Defendant has repeatedly refused a Joint Survey, unilaterally selected an umpire and blatantly failed to comply with the terms and conditions of the insurance contract. As the correspondence reveals, it is exactly the contrary. Despite the Plaintiff's actions, the Defendant intended to select an umpire in order to assist the Plaintiff in moving this case forward, the Plaintiff refused to cooperate. The Plaintiff at all meaningful times failed to investigate and make itself available for a survey. It is the Plaintiff that required the Defendant to file suit after the Plaintiff did nothing for nine months following the loss. It is the Plaintiff that insured a vessel with the stated value and failed to honor the claim. It is the Plaintiff that failed to pay for the Defendant's loss of tackle or even address that portion of the claim to this date.

On August 9, 2004, the Plaintiff filed this action thirteen days short of two years following the loss. Two years of lost income and two years of nonpayment to the Defendant. In its argument the Plaintiff states the Defendant has completely disregarded

4

the dispute resolution procedures contained in the insurance contract. Once again contrary to the assertions, the facts are clear that it is the Plaintiff that has failed to step forward and honor its obligations.

## CONCLUSION

The Defendant's Superior Court Complaint (Defendant in this action is the Plaintiff in the Superior Court action) is alleging breach of contract and violations of 176D(3)(9) and 93A, Section 11. As such, the Superior Court action should proceed for adjudication. The Plaintiff's argument that it should not be required to incur "unnecessary litigation" costs because of the Defendant's repeated refusal to comply with the required arbitration procedures is frivolous. The Plaintiff's conduct under the state's statutes will be judged regardless of any outcome in a Federal Arbitration proceeding. This action is about the Plaintiff's conduct not the Plaintiff's contractual obligations. This Superior Court action should proceed separately to avoid further continued loss to the Defendant.

Wherefore, the Defendant respectfully requests that this Honorable Court:

1. Deny the Plaintiff's request for appointment of an umpire;

2. Deny the Plaintiff's request to stay the action presently pending in the Plymouth Superior Court (Blue Water Enterprises, Inc. v. One Beacon Insurance Company, Civil Action No. 04187); pending the umpire's findings;

3. Grant the Defendant costs and reasonable attorneys fees in defending this action; and

4. Dismiss this action for failure to state a claim upon which relief may be granted.

> Respectfully submitted,
> Plaintiff, Blue Water Enterprises, Inc.,
> By its Attorney,
>
> */s/ Michael P. Mason*
> Michael P. Mason, Esq.
> BBO#543987
> MASON & DUFFY, P.C.
> 72 Sharp Street
> Hingham, MA  02043
> (781) 337-0066

Dated: September 10, 2004

Case 1:04-cv-11753-JLT   Document 3   Filed 09/13/2004   Page 7 of 19

**R... Scanlan, Master Marine Sur...yor**

CERTIFIED & ACCREDITED - UNITED STATES AND CANADA
P.O. Box 87, Nahant, Massachusetts 01908
781-595-6225 (office)   781-593-2711 (fax)

yacht1ship@aol.com

*Yachts & Ships – Power & Sailing*
*Serving Coastal New England, Cape Cod & the Islands*

www.mastermarinesurveyor.com

RECEIVED NOV 2 6 2002

ATTACHMENTS
Page ( 1 ) of ( 9 )


EXHIBIT
-1-

**PRIVILEGED AND CONFIDENTIAL**

DAMAGE SURVEY REPORT NUMBER: GALGANA - 02.10.6
PARTY REQUESTING THIS SURVEY: Law Offices of Mason & Duffy, P.C.

OWNER OF VESSEL: Blue Water Enterprises, Inc.
ADDRESS: P.O. Box 2682
CITY: Ocean Bluff    STATE: Massachusetts    ZIP: 02065
PHONE: 781-837-9826    CELL: 781-223-4000

NAME OF VESSEL: PRIM LADY
REGISTRATION/DOCUMENTATION NO: MS 2682 BW (current to 2004).
HOME PORT: Green Harbor, Massachusetts
VESSEL USE: Commercial Fishing.

UNDERWRITER: International Marine Underwriters    POLICY NUMBER: C 5 J H 5 1 3 1 7

DESIGNER/BUILDER: Provincial Boat and Marine Ltd.
BUILDERS HULL NUMBER: 8 1 7 8 9 8 (Canada).
COMMONWEALTH OF MASSACHUSETTS HULL NUMBER: M S Z M T 1 8 1 G 2 0 2

HULL MATERIAL: Fiberglass.
HULL COLORS: White hull & superstructure; blue cove; red boot stripe and blue bottom.
MODEL: 42' PROVINCIAL CUSTOM
LOA: 42' 0"    LWL: 39' 6"    BEAM: 13' 0"    DRAFT: 3' 6"
SPEED: 18-20 knots estimated.    GROSS TONS: 16,000 LBS.    NET TONS: 8,100 LBS.

**MAIN ENGINE**

ENGINE MANUFACTURER/MODEL: Mermaid Marine MONARCH DM177/4
ENGINE HOURS: 3,920.19    SERIAL NUMBER: 1 1 0 4 0    YEAR: 1995
TYPE: Diesel    CYLINDERS: In-Line (6)    HORSEPOWER: 300
MAINTENANCE LOG/OVERHAUL: Receipts and maintenance logs reported for an on-going and dedicated maintenance program prior to the loss.

DATE OF LAST SURVEY: 13 July 2002
DATE OF THIS SURVEY: 6 October 2002    DATE OF THIS REPORT: 12 November 2002
SURVEY LOCATION: Green Harbor Marine in Massachusetts.
PERSON(S) ASSISTING SURVEYOR: The attending surveyor only.

INSURED VALUE: $122,000.00    REPLACEMENT VALUE: $125,000.00

Page (2) of (9)

## BACKGROUND

The attending surveyor was contacted by Mr. Joseph Galgana of Blue Water Enterprises, Inc on 3 October 2002. Discussion was exchanged regarding damages sustained to his 42' PROVINCIAL commercial fishing vessel PRIM LADY.

Mr. Galgana informed me that he had retained the law office of Mason & Duffy, P.C. to represent him in damages sustained to the vessel as well as physical injuries he had resulting from this accident at sea.

My initial phone discussion with Mr. Galgana was extensive and consisted of the details of this accident at sea and his injuries. I directed him to contact his counsel to in fact retain me as their surveyor, expert witness and consultant in all areas of this loss. After a brief phone conversation with attorney Michael Mason on 4 October 2002, I was retained by Mason & Duffy, P.C.

## VESSEL PROFILE AND CONSTRUCTION PROGRAM

The PRIM LADY was hauled out of water supported properly on the hard with jackstands and keel blocks in a well lighted secured area of Green Harbor Marina. Boarding the vessel and visually inspecting the interior cabin, bilge areas; superstructure and forward deck areas, the vessel appears to have had a commendable maintenance program with no indications of any abuse or neglect. The vessel's state registration was current and the USCG safety gear on board would meet and exceed all USCG title 46 Commercial Vessel Safety requirements for her commercial fishing applications. The vessel was well fitted-out for her purpose.

The hull is a solid fiberglass lay-up. The forward deck, cabin roof and perimeter waste rails are molded fiberglass and cored with balsa. The hull is built on a semi-displacement type profile with a full-length keel, extended skeg supporting the rudder and protecting the running gear. The hull to deck joint is a "shoe-box-lid type" clamp; chemically bonded and mechanically fastened with threaded though bolts and heavy backing hardware. The perimeter rub rails are commercial-grade PVC with extra fiberglass chafe-gear added to the hull at the port side work/hauling station.

The shaft is 2-1/4" stainless steel with a four-bladed bronze prop. There is a new DURAMAX packless stuffing box for the shaft log. Steering is hydraulic with a stainless steel destroyer type wheel. Throttle and gear shift engine controls with push-pull cables and full engine instrumentation. Visual and audible engine alarms and RULE electric bilge pumps with float switches.

Page (3) of (9)

Longitudinal stringers are solid fiberglass. Transverse frame "grid-work" is foam-cored with several layers of fiberglass encapsulation. Fuel tanks appear to be fiberglass. The bottom of the fuel tanks and the outside of both fuel tanks are integral with the hull. Fuel-fillers to port and starboard are incorporated into the fiberglass support-knees. The fuel tanks are saddled to port and starboard and located under the forward sections of the workdeck and aft of the main transverse bulkhead. There is no inspection access for these tanks what-so-ever.

The upper perimeter gunwale has a heavy duty anodized aluminum extrusion chafe-cap. Work deck areas have two (2) self-draining scupper ports in the aft transom. There is a custom pipewelded aluminum gin pole with a block & tackle assembly on the starboard side with support base and a custom crafted, pipewelded retractable hauling davit on the pilothouse roof over the port side work/hauling station.

The cabin trunk and forward cabin roof are molded fiberglass integral with the hull and the superstructure-pilothouse is mechanically fastened and chemically sealed. Fasteners are through bolted with backing hardware for this application. There are seven (7) tempered safety glass fixed pane windows set-in commercial grade frames in the pilothouse. The port side work station/operators steering station has a lift-up weather panel with heavy duty custom fabricated stainless steel hinge-assemblies. Dinette table and seating to starboard in the pilothouse with a single bay stainless steel sink and cold pressurized water.

The heavy duty Pacer raw water pump is used to flood the four fiberglass ballast tanks and the fish hold which are also integral with the hull below the main work deck. This pump can also be utilized as an emergency de-watering pump. Access to the lower cabin is through the forward pilothouse. The helm console is molded fiberglass and the entire transverse bulkhead in the forward pilothouse is molded fiberglass. Below in the forward cabin, there are two V-berths and storage lockers with one BOMAR emergency escape hatch. There is no galley or cooking accommodations on board.

Electrical service is AC/DC with battery charger; UL listed marine grade electrical service breakers; 100amp main breaker; 16 service breakers and battery switch. Two (2) deep cycle, 8D series, commercial marine batteries are mounted outboard of the engine to starboard.

Electronics inventory consisted of Standard Horizon marine VHF radio; VHF radio antenna; Northstar-800 LORAN with LORAN antenna; 24nm range radar with radome; color-depth sounder; electric signaling horns and International COLREGS navigation lights; windshield wipers and ship's compass.

Page (4) of (9)

Lifesaving equipment consisted of a current ACR #2742/RLB-35 Category I EPIRB-406; VIKING 6-man liferaft with SOLAS-A pack; (6) type I offshore commercial PFD's; current marine grade flare kit and current marine grade First Aid kit.

Fire fighting equipment consisted of (3) KIDDIE 10-B:C marine grade/USCG approved fire extinguishers full-charged and current. All three were mounted in the approved brackets.

Ground tackle inventory is (1) DANFORTH anchor; 45' chain with approximately 500' of 5/8" nylon rode and (7) nylon docklines; four fenders with painters and (2) Gloucester balls.

Water system is pressurized cold water only and the potable water tank hold approximately 70-75 gallons. Water lines are PVC.

The hydraulic station has a 12" stainless steel Hydro-Slave hauler with cheek-plates; control lever to port in the forward pilothouse and high-pressure reinforced hydraulic hoses, fittings and 5-gallon capacity hydraulic fluid reservoir.

Deck hardware is commercial grade stainless steel and bronze cleats; mooring chocks; bow mooring eye and all are through bolted tight. There are (3) aluminum deck hatches on the work deck and (1) aluminum deck hatch in the pilothouse with dogging hardware. There is a fish hold hatch and engine compartment access hatch that are fiberglass and both lift-up for access.

The engine was manufactured by Mermaid Marine. It is a fresh water cooled six-cylinder diesel engine with raw water heat exchanger. The engine is turbocharged with a new breather/air-box filter installed. Transmission is a Twin Disc series with a reduction ratio of 2.5 : 1. Engine mounts are Clark Industries, bushed type mounts originally bolted tight to the fiberglass encapsulated beds. Exhaust discharge is at the transom through reinforced rubber steamhoses and heat lag-wrapped, exhaust manifold pipe.

The engine driven alternator is marine grade vapor proof rated @ 135-140 amp. The fuel system has a RACOR fuel water separator and USCG approved fuel feed/return lines. The engine is mounted under the forward work deck and just aft of the main superstructure/pilothouse bulkhead at midship.

Initial visual look of the engine and related machinery appears to be exceptionally well maintained. The engine and transmission was painted well with what seems to have been a dedicated and commendable maintenance program. Receipts and logs were on board in support.

**STRUCTURAL DAMAGES/OBSERVATIONS AND TESTING**

The intention is to determine the overall structural condition of the hull, given the extent of the damages sustained. This will include visual findings and observations and percussion sounding of the hull, decks, superstructure, longitudinal and transverse structural members or the "grid work".

Mechanical testing on the engine, transmission and any problems generated from the hit sustained and any electrical problems that may be directly related to this accident.

Mechanical engine testing will be the run-up of the engine to operating temperatures; running the engine in gear at all RPM's; independent testing by the attending surveyor with respect to an engine block compression leak test; oil analysis with samples of the oil in the engine block and transmission; pressure testing of the cooling system; independent gauge readings of the engine oil pressure and transmission pressure as well as further testing of the shaft alignment and engine alignment.

Electrical testing will be of all circuits and breakers; pumps; lights and electronics. Battery integrity, cell-load testing may also be conducted on both batteries.

There will be three sections of this inspection under the headings:

STRUCTURAL DAMAGES/FINDINGS
MECHANICAL DAMAGES/FINDINGS
ELECTRICAL SYSTEMS/FINDINGS

**STRUCTURAL DAMAGES/FINDINGS**

The hull was percussion sounded below the waterline and along the keel areas with no visible delamination detected.

The topsides from the waterline to the upper gunwale were further percussion sounded and inspected. There are areas on the starboard side of the hull that have sustained damages. The PVC rub rail has sustained fractures and pieces were missing. The entire PVC rub rail will need to be removed to better assess the overall integrity.

Page (6) of (9)

There are scrapes, nicks and gouges in the hull gelcoat finish on the starboard side extending from the forward quarter/bow area to the stern.

The anodized extruded aluminum rail cap is dented and the molded fiberglass wash rail/gunwale has sustained a structural fracture on the starboard side at midship. I question the integrity of the hull to deck clamp in this area. To further assess the overall integrity of this critical joint, the hull would have to be opened-up.

There is a deflection in the hull on the starboard side and there appears to be areas of confined delamination detected during the percussion sounding of this particular area.

Both diesel fuel tanks are integral with the hull. I question the integrity of the tanks and the inside hull areas of which the tanks are incorporated into. It is impossible to inspect the fuel tanks without cutting a major section of the work deck out. The fuel filler on the starboard side is molded fiberglass integral with a main structural support of the hull also. This has sustained a significant structural delamination/cracking. At this point, I recommend that the fuel be drained/pumped from both fuel tanks immediately. Both tanks in all probability, will need to be replaced given the construction program.

The molded fiberglass water tank has ruptured and the water has leaked out into the bilge area. Given the hit sustained, I would in fact have strong reservations about the water tank and emphasizing again the integrity of both fuel tanks. The water tank is constructed in the same program as both fuel tanks. Note also that both fuel tanks do have diesel fuel still in them. Pressure testing the fuel tanks at this time would not be any indication of the condition of the fuel tanks.

The integrity of the longitudinal stringers, transverse frames and overall structural "grid work" can only be assessed/inspected if the entire aft deck area extending to the pilothouse is removed.

The main transverse bulkhead which is the aft pilothouse wall shows significant pressure and the entire bulkhead appears racked and it bulges in an outward direction. The sliding access door does open hard and it can not open fully. Stress cracks noted along the upper perimeters of the interior pilothouse roof.

The molded fiberglass superstructure was through bolted and sealed with a silicone program. It is secured to the molded fiberglass cabin roof. This perimeter joint has been affected by the hit sustained to the vessel and the entire superstructure should come off and a new bedding program applied and refastened as original.

Page ( 7 ) of ( 9 )

The BOMAR emergency escape hatch in the forward cabin roof seal has been broken. The hatch appears to be leaking. The starboard side opening window in the pilothouse is cracked.

Down below in the forward cabin there are two berths. The fiberglass tabbing/secondary bonding on both have sustained delamination and stress cracking. These berths are glassed-into the inner hull sections.

The entire aft work deck was percussion sounded with several areas of structural delamination. The extent of the delamination runs from the centerline to the starboard and port side corners of the hull-bulwarks. The centerline deck hatches had excessive pressure and were difficult to lift. Further inspections and percussion soundings directed to the port side of the hull show that although the hits where on the starboard side, the extent of damages manifest over to the entire length of the port side of the hull.

## **MECHANICAL DAMAGES/FINDINGS**

The engine and the transmission have in fact sustained internal and external damages. The original program was to do an engine block compression leak testing and draw oil samples from the engine crankcase and the transmission to conduct a spectrometric analysis of these fluids. A sample of the coolant was also part of the testing.

After running a fresh water hose to the seastrainer and starting the engine, it was immediately noticed that there was no oil pressure recording on the helm gauge and the low-oil warning light was on at this initial start-up. At this point it was determined that the engine should be shut down immediately by the attending surveyor.

Drawing the dipsticks on the engine and transmission showed that both have been contaminated. Traces of water were detected in the engine oil and the transmission fluid had traces of engine oil. After opening the expansion tank cap to inspect the cooling fluid, traces of oil were detected in the coolant mix.

The engine and the transmission will need to be removed from the vessel and taken to an authorized facility. The engine and transmission will need to be disassembled to better assess the extent of the internal damages.

The Clark Industries bushed engine mounts all appear out of alignment due to the hit sustained. These mounts were originally bolted tight to the longitudinal stringer caps.

Page ( 8 ) of ( 9 )

The stainless steel prop shaft, the DURAMAX shaft seal and related bearings have also ruptured. The shaft appears to be out of alignment and the stern bearing will need to be replaced.

The transmission flange to shaft flange bolt up assembly appears out of alignment also. Shaft will need to be removed and aligned/replaced. Cutless bearing in the stern fitting will also need to be replaced due to the alignment of the machinery.

During the short running time, the exhaust water discharged onto the ground was contaminated with unburned fuel. The turbocharger may have sustained damages. Inspection of the coolant fluid circulating through the expansion tank also showed significant traces of oil-contamination.

Engine/transmission seals and gasket assemblies are leaking.

No further tests cold be conducted due to the internal damages sighted and the inability to bring the engine up to full operating temperature.

**ELECTRICAL SYSTEMS/FINDINGS**

Both 8D marine deep cycle batteries are mounted on the starboard side at midships; outboard of the engine. Both will need to be replaced. I question the integrity of the cells and plates in each battery. All electronic instrumentation will need to be bench tested and the battery charger/converter will need to be tested. Both batteries failed the load test placed on each. Batteries will in fact need to be replaced. Have all electronics tested.

**CLOSING RECOMMENDATIONS/OPINIONS**

The vessel is built for commercial fishing. Given the elaborate construction program, lay-up of the hull and "grid work", only the builder would be qualified to remove any structural sections of the vessel and perform the extensive repairs needed to make the hull sound. Local shops will not warrantee the hull or any of the work performed. To further assess/inspect the internal hull damages, the entire hull would have to be shipped back to the manufacturer in Canada. There can be no further inspection of the hull damages until the entire aft deck from the transom to the forward pilothouse has been removed. Given the extent of the damages and what I suspect could be additional latent structural damages, the boat will in all probability be a total loss due to the numerous damages sustained. This vessel can not be operated. It is unsound and not fit for navigation given the extensive structural and mechanical damages. Do not operate the engine.

PAGE ( 9 ) OF ( 9 )

THIS DAMAGE SURVEY CONDUCTED ON THE F/V PRIM LADY HAS BEEN PREPARED AND SUBMITTED IN GOOD FAITH. IT IS UNDERSTOOD AND AGREED THAT THE SERVICES RENDERED BY ROB SCANLAN, MASTER MARINE SURVEYOR AS THE ATTENDING SURVEYOR WERE PERFORMED TO THE BEST OF MY ABILITY. ANY REPORTS FURNISHED, EITHER ORAL OR IN WRITING, ARE ACCEPTED AS MY OPINION AND BEST JUDGMENT. THEY ARE NOT IN ANY WAY INTENDED AS A REPRESENTATION OR WARRANTY AS TO THE CONDITION OF THE VESSEL OR ANY OF ITS PARTS. IT IS FURTHER UNDERSTOOD AND AGREED THAT THE ATTENDING SURVEYOR OF RECORD WILL NOT BE RESPONSIBLE FOR ANY LOSS OR DAMAGE, DIRECT OR CONSEQUENTIAL, ARISING OUT OF THE CONDITION OF THE VESSEL, OR BY ANY ERROR OR OMISSION ON MY BEHALF AS SURVEYOR.

REMARKS :

I reserve the right to amend, extend and amplify the contents of this report in light of additional information or as circumstances warrant.

TRAVEL & EXPENSES: 3.0 HOURS TO DATE.

HOURS AT THE VESSEL: 5.25 TO DATE.

HOURS AT THE OFFICE: 4.75

TOTAL HOURS: 13.0

*[signature: Rob Scanlan]*

ROB SCANLAN, CMS/MMS/ACMS
CERTIFIED & ACCREDITED
UNITED STATES, CANADA & AUSTRALIA
USSA MASTER MARINE SURVEYOR #0121088/S



Intermodal Transportation Services, Inc.
Marine Surveying Division
175 Paramount Drive
Raynham, MA 02767
Telephone: 508-828-2998
Facsimile: 508-828-6597
E-Mail: David_Wiggin@itsinspections.com
       David.Wiggin@verizon.net

May 10, 2003

**VIA FAX #781-337-2266 (total 2 pages)**
Atty. Michael Mason
Mason & Duffy, P.C.
72 Sharp Street, Unit A9
Hingham, MA 02043-4362

Re:  Bluewater Enterprises Inc., F/V PRIM LADY
     IMU Claim #OBM00328Y, Our File #31022524
     Collision, August 24, 2002
     Third Party: Jeff Lee Bolster, F/V SNOW GOOSE
     RECOMMENDED PRELIMINARY REPAIRS

Dear Atty. Mason:

In follow up to our April 23, 2003 preliminary survey held aboard the F/V PRIM LADY at Green Harbor Marina, in company with Mr. Joseph Galgana, and instructions from International Marine Underwriters, we recommend that the following be arranged, so that we can ascertain the nature and extent of damage sustained in consequence of the collision:

  1) Removal of the aluminum cap rail and the upper and lower PVC rub rails along the starboard side from the deck/hull in way of the 1st and 2nd points of impact, so that we can further examine the deck and hull for condition, damage, etc.

  2) The services of a qualified diesel engine mechanic (such as Mr. Gorham or others) should be engaged to conduct further examination and testing of the assembled diesel engine and related machinery, so that a proper assessment of the conditions can be made prior to any removals and/or disassembly. We recommend the following:

    a) Measurement of the propeller shaft for condition and possible run-out using a dial-indicator. This should include removal of the propeller and measurement of the shaft taper and visual inspection of the stern bearing prior to launch, and measurement of the shaft for run-out at the Duramax seal, intermediate bearing and couplings, examination of the Duramax shaft seal, prior to and after launch.

    b) Sampling of the lube oil, gear oil and coolant prior to engine start up. Samples are to be sent to an independent lab(s) for analysis. Change the lube oil and filters, gear oil and coolant, if deemed necessary prior to engine start up.

EXHIBIT -2-

2

Bluewater Enterprises Inc., F/V PRIM LADY
IMU Claim #OBM00328Y, Our File #31022524
Collision, August 24, 2002
Third Party: Jeff Lee Bolster, F/V SNOW GOOSE
RECOMMENDED PRELIMINARY REPAIRS, May 10, 2003

c) Pressure testing of the cooling and fuel systems. Check hydraulic systems, particularly the hydraulic pump and alignment to the engine. Load testing of the batteries, etc.

d) Install independent mechanical gauges on the machinery for engine lube oil and gear oil pressure, turbocharger boost, fuel pressure and water temperature, and if necessary exhaust temperature.

e) Conduct engine roll-over test using battery power to check the engine for lube oil pressure before engine start up. Start engine, if lube oil pressure and other conditions are found to be satisfactory and monitor engine operating conditions, etc.

f) Conduct compression test, if deemed necessary.

g) Launch, sea trial and check operation of the machinery and systems.

3) Conduct any other repairs deemed necessary by the attending parties.

We understand that the International Marine Underwriters (IMU) have agreed to pay the reasonable costs of the removal of the cap and rub rails, the aforementioned testing and/or examination of the machinery by Mr. Galgana's mechanic, as well as launching of the vessel, sea trial and subsequent hauling. Please furnish this office with the estimated costs of conducting the above work, so that we can review and forward the information to the adjuster, Ms. Bernice Ford at IMU.

Please let us know when the above work is to be completed, so that we can arrange to attend the testing and joint survey with the concerned parties.

Also, Mr. Galgana reported that a Pre-Purchase Survey and Machinery Survey were not conducted on the vessel prior to his purchase of the vessel; however we understand that a survey was conducted by a Mr. Clark about July/August 2002. Please provide this office with a copy of this survey for our review.

Please feel free to contact me should you have any questions.

The above is a statement of opinion, made and submitted without prejudice to the rights and/or interests concerned, and is subject to the terms and conditions of the policy of insurance.

David R. Wiggin
Marine Surveyor
Intermodal Transportation Services, Inc.

Cc: Ms. Bernice Ford, IMU-Boston