

**JAMES T. SIMONITSCH**

INDEPENDENT MARINE SURVEYOR

P.O. BOX 192, ROUND POND, ME 04564

TEL: 207-529-6885 • FAX: 207-529-6887

April 18, 2005

By USPS

Mr. Timothy Duffy
Mason & Duffy, PC
72 Sharp Street
Hingham, MA 02043

RECEIVED

MAY 2 6 2005

CLINTON & MUZYKA, P.C.

Mr. Kenneth M. Chiarello
Clinton & Muzyka, PC
1 Washington Wall, suite 1400
Boston, MA 02108

Re: OneBeacon Insurance Company vs. Blue Water Enterprises Inc., civil action #04-11753-JLT

Dear Mr. Duffy and Mr. Chiarello:

This is by way of a final report in reference to the above captioned action.

### APPOINTMENT

Enclosed please find "Status Report on Appointment of Umpire", dated October 11, 2004. Consistent with that appointment, this report will address:

1. The nature and extent of the damages sustained to the F/V "Prim Lady".
2. Any recommendation for additional repairs.

### DOCUMENTS REVIEWED AND CONTACTS MADE

I have enclosed as enclosure #1a bibliography reflecting those printed documents reviewed by the undersigned in order to assist in the formulation of opinions expressed later in this report. I have also included a list of industry contacts as enclosure #2. These contacts were made by the undersigned in order to be able to assist in the formation of opinions expressed later in this report. I do bring to your

*MEMBER NATIONAL ASSOCIATION OF MARINE SURVEYORS*

Mr. Duffee and Mr. Chiarello
April 16, 2005
Page 2

attention at the time of the verbal contacts with members of industry, no mention was made of the boat's name and/or the owner's name.

## CONFERENCES/SURVEYS

Meetings were held at the boat on two occasions as follows:

1. November 23, 2005-The boat was located at Green Harbor Marina, Brant Rock, Massachusetts. The purposed of the meeting was to receive presentation of opinions and documentation from both the plaintiff's and the defendant's experts. Those attending were:
   A. Mr. Joseph Galgana- President of Blue Water Enterprises, Inc.
   B. Mr. David Wiggin- Marine Surveyor representing OneBeacon America Insurance Company
   C. James T. Simonitsch- Marine Surveyor, Umpire

   Not in attendance was Mr. Rob Scanlan, Marine Surveyor, representing Blue Water Enterprises Inc. Mr. Scanlan later explained his absence as due to a schedule conflict. The meeting was scheduled with the reasonable anticipation of the attendance of all principals. It went forward in the absence of Mr. Scanlan.

2. April 7, 2005- The boat was located at Green Harbor Marina, Brant Rock, Massachusetts. The purpose of the meeting was to receive presentation of opinions and documentation from both the plaintiff's and the defendant's experts, in order to address the concerns of the plaintiff as contained in Mason & Duffy's letter dated February 4, 2005 and any other pertinent concerns. Those in attendance were:
   A. Mr. Joseph Galgana- President of Blue Water Enterprises, Inc.
   B. Mr. David Wiggin- Marine Surveyor representing OneBeacon America Insurance Company
   C. Mr. Rob Scanlan- Marine Surveyor representing Blue Water Enterprises Inc.
   D. James T. Simonitsch- Marine Surveyor, Umpire

Mr. Duffee and Mr. Chiarello
April 16, 2005
Page 3

The meeting began at 8:30 am and proceeded without break(s) to 1:30 pm the same day. Mr. Scanlan and Mr. Wiggin were provided with copies of e-mail correspondence to include photographs exchanged between the Umpire and the builder of the boat, as well as, worksheets based upon

Mason & Duffy's letter of February 24, 2005.

## RESPONSE TO MASON & DUFFY LETTER FEBRUARY 24, 2005

Following the Damage Survey of November 23, 2004, a report was issued by the Umpire. The survey was conducted in the absence of Mr. Rob Scanlan, Marine Surveyor for the plaintiff and without his input.

It was the Umpire's opinion that in order to respond to the plaintiff's concerns expressed in Mason & Duffy's letter of February 24, 2005 that a second conference/survey with the plaintiff's and the defendant's surveyors present was necessary.

The conference was held. A worksheet based upon the above captioned letter was prepared by the Umpire with copies for the surveyors. Each item was thoroughly discussed with notes taken. At the conclusion of the conference questions, concerns, additions, and/or deletions were solicited from the two experts. None were received.

In the announcement for the meeting the Umpire made five requests of the plaintiff. The requests with the plaintiff's responses are as follows:
1. Provide the protocol and the date of the load test of the boat's batteries. The batteries were tested using a Medtronic's Digital Battery Analyzer at the time of the damage survey performed by Mr. Scanlan and reported in his report "2.10.6".
2. Copies of lube oil analysis of the engine lube oil and the gear lube oil. No analysis was performed. Mr. Scanlan's opinion in reference to the contamination were based upon visual inspections of both oils and the oily

Mr. Duffee and Mr. Chiarello
April 16, 2005
Page 4

film coating the inside of the heat exchanger reservoir.

3. The service record of the engine. This was not provided.

4. Photos taken by Mr. Scanlan at the time of his initial survey. Thirty-nine film photographs were provided by Mr. Scanlan and form an enclosure to this report. The originals are enclosed in the plaintiff's copy of this report, with color copies to the defendant and file.

5. Photos taken by Mr. Clark of East Bay Surveyors at the time of his survey. None were provided.

## PLAINTIFF'S DIGITAL PHOTOGRAPHS

At the conference/survey of April 7, 2005 the plaintiff provided five series of photographs. Some with notes in place and with the plaintiff assigning dates to the photographs in four of the five series. These photographs form an enclosure to this report. The originals are enclosed with the plaintiff's copy of this report with color copies provided to the defendant and the file.

## UMPIRE'S RESPONSE TO MASON & DUFFY'S LETTER OF 2/24/05

In response to the concerns raised by Mason & Duffy's letter of February 24, 2005, I offer the following responses based upon input as noted in the bibliography, conferences, contacts with members of the industry, plaintiff's photographs, and personal experience:

1. Mr. Galgana placed a down payment on the boat prior to purchase. The seller continued to use the boat for approximately 341-hours of operation at the completion of which the plaintiff purchased the boat from the seller.

2. **DAMAGES ATTRIBUTED TO FAIR WEAR AND TEAR:**
   a. Broken starboard window-Not present pre-incident. Please refer to repair recommendation #18.
   b. Bench seat- The cracks at the edge of the laminates to the bench did not preexist the incident of 8/24/02. It was caused by a jarring of the hull at the time of the collision. The cracks were exacerbated by the improper preparation of bonding surfaces. Please refer to

Mr. Duffee and Mr. Chiarello
April 16, 2005
Page 5

repair recommendation #5.

3. **AREAS OF DELAMINATION DISCOVERED AND MARKED BY SCANLAN-**
   a. Starboard bow-None detected at Scanlan's mark.
   b. Main deck or platform-Changes in sound due to construction detail, thickness of flat lay-up of platform/split tube support and normal flexing. No delamination present.

4. **DAMAGES TO THE STARBOARD SIDE OF THE HULL IN ADDITION TO THE TWO MAJOR AREAS OF CONTACT.**
   Scratches and gouges on the starboard topsides aft of the forward impact area can be attributed to the incident. Please refer to repair recommendation #6.

5. **RESERVATION IN REFERENCE TO THE HULL TO DECK CLAMP CONNECTION POINT.**
   In order to ascertain damages in this area it will be necessary to:
   a. Remove aluminum guard
   b. Remove PVC guards
   c. Survey scope of damages
   d. Estimate repairs. Please refer to repair recommendation #1.

6. **THE SHOEBOX LID TYPE OF JOINT.**
   This type of hull to deck joint is very strong and very common. Please refer to item #5.

7. **RECOMMENDATIONS FOR INSPECTING HULL, FRAMES, STRINGERS, AND STRUCTURAL MEMBERS.**
   In response I offer:
   a. Per Gordon Campbell, all tabbing is on the exterior of the tanks on boats built in 1995. What you see is what you have. No deficiencies on the exterior were noted.
   b. The potable water tank was filled following the incident, but is now

Mr. Duffee and Mr. Chiarello
April 16, 2005
Page 6

empty.

   c. Aft of the port and starboard fuel oil tanks are two port and
starboard ballast tanks per Mr. Joe Galgana on April 7, 2005.

   d. Per Mr. Joe Galgana both the port and starboard fuel oil tanks
contain fuel oil.

   e. No fuel oil leaks are apparent.

   f. Provincial Boats and Marine Ltd. can mold a replacement fuel oil
fill and knee.

   g. Please refer to repair recommendation #2.

8. **UPPER PILOTHOUSE PANEL AT HINGES WERE CRACKED.**
What looks like a crack is not a crack. No damages are present.

9. **QUESTIONS IN REFERENCE TO THE INTEGRITY OF THE
TRANSVERSE FRAMES AND LONGITUDINAL STRINGERS UNDER
THE PILOTHOUSE SOLE AND WORK DECK IN THE AMIDSHIPS
AREA BUT COULD NOT BE INSPECTED AND ARE NOT ACCESSIBLE.**
In response:

   a. No deficiencies were noted below the pilothouse sole (continuous
with the platform).

   b. Please refer to #7 in this series in reference to support of the
platform.

10. **QUESTIONS IN REFERENCE TO THE TABBING SYSTEM OF
PARTIAL BULKHEADS.**
There are no failures of the tabbing system at partial bulkheads.

11. **QUESTION IN REFERENCE TO REPAIRS TO THE HULL TO DECK
JOINTS.**
Please refer to number 5 in this section and repair recommendation #1.

12. **QUESTIONS IN REFERENCE TO A FILLER NECK KNEE THAT WAS
DAMAGED.**
Please refer to #7f in this section. This will be part of the repairs and

Mr. Duffee and Mr. Chiarello
April 16, 2005
Page 7

cleaning operation on the starboard fuel oil tank.  Please refer to repair recommendation #2.

13. **QUESTION IN REFERENCE TO THE CRACKED JOINT IN THE AREA OF THE MOLDED FIBERGLASS SUPER STRUCTURE AT THE JUNCTURE OF THE CABIN ROOF.**
There is no claim-related damage in this area.

14. **QUESTIONS IN REFERENCE TO THE PILOTHOUSE ROOF EXTENSION AND ITS SUPPORT.**
The slider panel and fixed panel have made recent contact.  Scuffing is present on the fixed panel.  See repair recommendation #7.

15. **QUESTION IN REFERENCE TO SLIDING PANELS AT THE END OF THE PILOTHOUSE.**
Please refer to #14 in this section.

16. **SUPPORT OF THE PILOTHOUSE ROOF.**
The support is not damaged.  There is not issue with the support.

17. **QUESTION IN REFERENCE TO THE TESTING OF THE STEERING.**
Please refer to repair recommendation #16.

18. **BROKEN WINDOW ON THE PORT SIDE BEING PREEXISTING. (SHOULD READ STARBOARD).**
Please refer to #2a in this section.

19. **OBSERVATIONS OF TABBING SYSTEM BETWEEN LONGITUDINAL BULKHEADS PORT AND STARBORAD.**
Please refer to repair recommendation #2.

20. **PRODUCTION PROBLEM ON THE BUILT-INS IN THE AREA OF THE HEAD AND BENCH SEATS.**
Please refer to #2b in this section and repair recommendation #5.

Mr. Duffee and Mr. Chiarello
April 16, 2005
Page 8

21. **LEAKING BOMAR ESCAPE HATCH.**
The Bomar escape hatch was incorrectly installed due to a lack of
bedding compound and the lack of sealing of exposed Balsa core at the
cut-out, and lastly the lack of sealing of the fastener holes. This has lead
to a leak(s) that are not claim related but are coincidental with the storage
period.

22. **INTEGRITY OF STARBOARD WATER TANK AND STARBOARD FUEL
TANK.**
Please refer to repair recommendation #2.

23. **CONTAMINATION OF THE CRANK CASE OIL AND TRANSMISSION
FLUID.**
Mr. Galgana complained that the engine ran poorly following the incident.
The symptoms included:
   a. Vibrations
   b. Smoke
   c. Engine overheat
   d. Low lube oil pressure on gauge
   e. Contamination of lube oil
   f. Engine oil leaks

Based upon my observations:
   a. An oily film is present on the interior of the heat exchanger,
      indicating an oil leak at some time in the service life of the engine
      from the engine lube oil system into the cooling system.
   b. It is impossible for engine lube oil to contaminate the reverse gear
      lube oil as each has a dedicated cooler.
   c. No sample of the lube oil in the engine or reverse gear were sent
      out for analysis.
   d. The service history of the engine is unknown.
   e. Please refer to repair recommendation #3b.

Mr. Duffee and Mr. Chiarello
April 16, 2005
Page 9

24. **ENGINE MOUNTS DISTURBANCE.**
Check engine alignment on land and in water following repairs. Please refer to repair recommendation #8.

25. **RUN OUT OF PROPELLER SHAFT.**
The propeller shaft run-out should be checked as a matter of good repair custom and practices following a collision and complaints of engine vibrations. Please refer to repair recommendation #9.

26. **CONDITION OF DURAMAX BEARING.**
The owner reported the packless shaft gland leaked after the incident. Please refer to repair recommendation #10.

27. **LOAD TESTING OF BATTERIES BY SCANLAN.**
Please refer to repair recommendation #11.

28. **HOURS OF USE LOGGED BY THE HOUR METER.**
Per Mr. Galgana's documentation by surveys and photos, the boat was operated approximately 10-hours under his ownership.

29. **DISCLAIMER CONTAINED IN THE UNDERSIGNS REPORT.**
The Umpire spells out the parameters of his survey observations. The defendant's and plaintiff's surveyors acknowledged similar limitations. No invasive or destructive or laboratory testing has reported to have been performed by either the plaintiff and/or the defendant.

## ESTIMATE RECOMMENDATIONS

The full scope of damages caused by the incident remain unknown. With that said the full cost of repairs cannot estimated.

First the engine should be inspected and diagnosied in place. The findings reported and the cost of incident related repairs estimated.

Mr. Duffee and Mr. Chiarello
April 16, 2005
Page 10

Secondly, the starboard hull to deck joint should be exposed, the incident related damages scoped out, and repairs to the incident related damages estimated.

Thirdly, the starboard tanks, (potable water, fuel oil, and ballast) must be inspected with the potable water tank tested for leaks. The fuel oil should be pumped from both tanks after isolating the port tank. The starboard tank opened up at the filler and examined. Both starboard ballast tanks should be opened and the interior inspected. The results should be reported and recommendations made, and repairs to incident related damages estimated. If damages are found in the starboard tanks, questions are raised in reference to the condition of the port tanks.

Fourth, estimates for the following work should be received and evaluated. This would include:

1. Estimated cost of repairs to incident related damages to the engine and reverse/reduction gear.
2. Estimated cost of incident related repairs to the starboard shear and wash rail.
3. Estimated cost of incident related repairs to the starboard potable water, fuel oil, and ballast tanks.
4. If damages are noted in the starboard potable water tank, fuel oil tanks, and ballast tanks entry for inspection through the platform must be made into the port forward void, fuel oil tank, ballast tanks. Observations reported, the repair of incident related damages estimated, and recommendations made.
5. The estimated cost of incident related repairs covered by the remaining recommendations, which follow.

By going through steps one through five, a decision can be made about the feasibility of repairs.

## REPAIR RECOMMENDATIONS

1. Remove guards in areas of impact on the starboard side and estimate the cost of repairs. This should be done before initiating any repairs. Repair procedures may

Mr. Duffee and Mr. Chiarello
April 16, 2005
Page 11

include:
    a. Consider partial lay up of starboard wash rail from the builder.
    b. Repair the hull at the shear; match gel coat as possible.
    c. Insert and secure new section of wash rail if feasible.
    d. Repaint non-skid on the wash rails where disturbed.
    e. Install replacement guards.
    f. Refer to repair recommendation #6.

2A. Cut out damaged starboard fuel fill for starboard fuel oil tank and inspect and report findings and estimate cost of incident related repairs to the knee, tank top, and for cleaning and flushing the tank.

B. Fill the potable water tank with colored water (vegetable dye) and tape white paper towels to the exterior and at the bottom perimeter. Pressurize tank to 3 PSI. Report results. Estimate cost of incident related repairs.

C. Cut inspection parts in starboard ballast tanks through the platform to be later fitted with 10" Anchor Hatch or similar. Inspect for damage, report, and estimate cost of incident related repairs, if any.

D. If damages are present in the starboard fuel oil or ballast tanks, the port tanks must be opened and inspected. Claim related damages, if any noted, and repairs of incident related damages estimated. The tanks once opened up should be inspected by the plaintiff's and defendant's surveyors.

3A. Request from the boat seller, Mr. Scott King:
    a. The name of the engine dealer who sold the engine.
    b. The service record of the engine.
    c. Name and phone # of the servicing mechanic in Nova Scotia.

B. Secure the services of a marine diesel mechanic to perform an examination and analysis of the engine and its operation in place in the boat. The mechanic's diagnosis and recommendation should be reviewed for possible relationship to the

Mr. Duffee and Mr. Chiarello
April 16, 2005
Page 12

incident upon which this action is based and an estimate obtained for the repair of incident related damages. Both surveyors should meet with the mechanic at the boat at the completion of his field inspection for a critique.

4. A bench check of the electronic devices aboard the boat at the time of the incident should be made with a report made diagnosing any failures and estimate prepared covering the repair of incident related damages.

5. Fill, fair, and match gel coat as best possible, cracks at the bench seat, between the molded seats and tabs port and starboard in the cuddy.

6. Fill, fair, and re-gel to match as best possible scratches in the starboard topsides of the hull aft of the forward impact area. Blend with repairs to the shear.

Compound and wax starboard topsides to blend repairs.

7. Remove the pilothouse aft slider panel and trim to permit easy passage past the fixed panel. Compound out stains on fixed panel.

8. Check engine alignment following repairs. Rough alignment should be made on land, final alignment in the water.

9. Check propeller shaft run out at the taper and at two points inside the boat. Report findings.

10. Check Duramax bearing and adjust as necessary.

11. Replace two each 8D 12-volt batteries in kind and quality.

12. Reseal the area of stress crazing at the top of the starboard aft canopy support.

13. Conduct sea trials of all repairs following the repair process. Of necessity this will include the steering system.

Mr. Duffee and Mr. Chiarello
April 16, 2005
Page 13

14. The repair estimate (s) should include:

14A. Haul, launch, set aside, and moves within the yard should be estimated.

B. Trucking from storage area to repair facilities.

C. Disposal of hazardous waste is the responsibility of repairer.

D. Lay days during repair process may be incurred and cost should be estimated.

E. Estimate should include freight and taxes.

15. Any scrap value represented by replaced parts should be credited to the account of the repairs.

16. With the engine running the steering system should be tested, incident related damages if any noted and repairs estimated.

17. The use of Vinyl Esther resin is recommended for the reestablishment of secondary bonds.

18. Replace starboard broken pilothouse window.

19. There is a possibility that during the repair process previously undisclosed incident related damages may be discovered. In that case, the plaintiff and the defendant are to be notified, work in that area stopped pending an inspection, and a separate estimate addendum prepared.

## REMARKS AND OPINIONS

1. At this time, and in the absence of any evidence to the contrary, the boat is repairable.

2. The removal of the deck platform is not justified at this point. Other less

Mr. Duffee and Mr. Chiarello
April 16, 2005
Page 14

destructive methods of observations and evaluations and repairs are available.

3. The repair process must first carefully scope out the unknown incident related damages to the hull, engine, and electronics. Following that estimates prepared .and the overall repair project estimated and reviewed by both parties.

4. Mr. Galgana stated on April 7, 2005 that the engine has not been started or barred over since the shut down following the incident. He did winterize the engine in 2002. An engine should be re-winterized each winter with the engine running in keeping with generally accepted customs and practices.

5. Mr. Galzana stated on April 7, 2005 that he is a diesel mechanic.

6. During the development of the scope of the damages, careful consideration must be given to categorizing the nature and cause of all damages noted. Four suggested categories are:
   1. pre-existing damage
   2. fair wear and tear damage
   3. Incident related damage
   4. Deterioration occurring subsequent to the incident during the prolonged lay up period.

7. The engine, per the owner, has had worked performed on it at least one cylinder causing the engine to be opened up by the repairer. The cause and nature of the

failure is unknown. The work was performed during the previous owner's tenure.

8. It is recommended that the complete service record for the engine and reverse/reduction gear be obtained from the seller's service provider and/or from computer records, which might be maintained by the manufacturer.

9. The damage to the starboard side of the boat in the are of impact #1 and impact #2 is minimal given the evidence of the incident and the extent of damages noted.

Mr. Duffee and Mr. Chiarello
April 16, 2005
Page 15

10. The chances of damages from the impact to the batteries is extremely remote but possible.

11. The chance of damages to the engine and/or reverse gear given the evidence of the impact is extremely remote but possible.

12. The damages to the packless shaft seal given the evidence of the impact is extremely remote but possible.

13. The builder of the boat maintains a good reputation for quality of product.

14. The grid work support for the platform is extremely strong and no evidence of it being disturbed was noted.

15. Every boat builder is not necessarily the best repairer of his/her boats. Nor are they the only repairer to be considered.

16. It is impossible to perform an eye ball analysis of:
    a. Minor water contamination of the lube oil in the absence of emulsification of the lube oil.
    b. An eye ball analysis of shaft/coupling alignment.
    c. Lube oil contamination of the coolant as to source.
    d. Bearing failures.

17. The owner has done little or nothing to protect and/or preserve the boat in the area of the Bomar escape and the condition of the main engine and reverse/reduction gear since the incident. The application of Duct tape or similar on the interface of the mounting flange of the escape and the trunk roof would prevent the infiltration of water into the Balsa core of the trunk roof.

The engine could not be properly winterized without the engine being run, sea water coolant replaced by antifreeze mix, lube oil and filter changed, and oil induced into the cylinders. Winterization must also be directed to the reverse/reduction gear.

Mr. Duffee and Mr. Chiarello
April 16, 2005
Page 16

18. In reference to the choice of repairers, there are many highly qualified repair yards in the New England coastal area. Consideration should be given to the reputation of the yard, qualifications, nearness so inspection can be made easily and regularly, labor rates, references, and timeliness of repairers. There is no justification for returning this boat to the builder for repairs. Repairs being requested to bid must be provided with a definitive scope of work to be performed.

## DISCLAIMER

This second and final report is based upon additional input received from the plaintiff and defendant, as well as, researched by the Umpire, subsequent to the first inspection/conference of November 23, 2004. It represents fair and unbaised observations, opinions, and recommendations developed by the Umpire without the removal of paneling, ceiling, or other portions of the propulsion machinery or fittings for internal examinations. None have been authorized by the boat owner. The possibility of incident related damages being present beyond those observed and reported has been fully established and recommendations made.

Umpire signs without prejudice,

James T. Simonitsch
Certified Marine Surveyor

Enclosures:
1. Bibliography
2. Industry contacts
3. Digital photographs from J. Galgana
4. Film photographs from R. Scanlan.
5. Method of testing the boats batteries from R. Scanlan.
6. Cover page of East Bay Surveyors report of survey July 13, 2002.
   Cover page of Rob Scanlan, Marine Surveyor, reported dated November 12, 2002 with highlights provided by J. Galgana April 7, 2005.

Mr. Duffee and Mr. Chiarello
April 16, 2005
Page 17

Enclosure #1

## **BIBLIOGRAPHY**

The following documents were reviewed by the Umpire:

1. Mr. Rob Scanlan, Damage Report, Galgana "2.10.6"
2. Mr. Rob Barry's damage estimate 1/17/03
3. Massachusetts's environmental police report 8/26/02
4. East Bay Surveyor's Condition and Value Survey report date unknown
5. ITS preliminary report to IMU, April 25, 2003
6. ITS preliminary recommended repairs, May 10, 2003
7. ITS preliminary report #2, May 19, 2003
8. Marine Safety Consultants fax of May 24, 2003, with enclosures:
    a. Marine Safety Consultants Damage Survey file #02-0997, 9/30/02
    b. D. N. Kelley, Inc Shipyard estimate, February 4, 2003
    c. J & D Fiberglass boat repair invoice September 17, 2002
9. Gorham Diesel letter of June 10, 2003 and letter of July 18, 2003

Mr. Duffee and Mr. Chiarello
April 16, 2005
Page 18

Enclosure #2

## INDUSTRY CONTACTS

1. Mr. Greg Sanborn, head mechanic, Billing's Diesel and Marine, Stonington, Maine. reference engine failures following collisions and allisions.

2. Mr. Art Stanley, Art's Marine Service, Owls Head, Maine-reference engine failures followings collisions and allisions.

3. Mr. Gordon Campbell, Provincial Boat and Marine, Ltd., Kensington, PEI, Canada-reference construction details of their 1995 model 42' fishing boat.

4. Mobile Glass Service, Bristol, Maine-reference characteristics of break in starboard pilothouse window

Mr. Duffee and Mr. Chiarello
April 16, 2005
Page 19


Enclosure #3

## GALGANA DIGITAL PHOTOGRAPHS

07-09-02
W Delivered to
H.B. MA





06-29 02
ready for shipment
to I.A. MR

06-29-02

06-27-04



06-29-01

06-29-02

06-38-03



06-29-02

06-29-01

06-29-02













03-07-02

03-07-02



Mr. Duffee and Mr. Chiarello
April 16, 2005
Page 20

Enclosure #4

## SCANLAN FILM PHOTOGRAPHS











Mr. Duffee and Mr. Chiarello
April 16, 2005
Page 21

Enclosure #5

## METHOD OF TESTING BOATS BATTERIES

Subj:    **[MSE] DIGITAL BATTERY ANALYZER**
Date:    **4/4/2005 3:10:18 PM Eastern Daylight Time**
From:    Yacht1Ship
To:      marinesurveyorexchange@yachtsurv.com

*I LOAD TEST EVERY BATTERY IN EVERY PRE-PURCHASE SURVEY.*

*THE UNIT I HAVE BEEN USING FOR THE PAST TWO YEARS IS:*
*MIDTRONICS DIGITAL BATTERY ANALYZER*
*MODEL #POWER SENSOR MICRO400*
*1-800-776-1995 OR 630-323-2800.*

*IT HAS BEEN VERY VALUABLE TO ME FOR TESTING*
*GROUP 24, 27 AND 31-SERIES BATTERIES AS WELL*
*AS THE 4d AND 8D COMMERCIAL BATTERIES.*

*THEIR WEBSITE IS **WWW.MIDTRONICS.COM***

*ROB SCANLAN, CMS/MMS/ACMS*

Mr. Duffee and Mr. Chiarello
April 16, 2005
Page 22

Enclosure #6

## <u>COVER PAGE OF EAST BAY SURVEYORS-REPORT OF SURVEY</u>
## <u>APRIL 13, 2002</u>

## <u>COVER PAGE OF ROB SCANLAN, MARINE SURVEYOR, REPORT DATED</u>
## <u>NOVEMBER 12, 2002</u>
## <u>WITH HIGHLIGHTS PROVIDED BY J. GALGANA,</u>
## <u>APRIL 7, 2005</u>



# EAST BAY SURVEYORS

## ROBERT V. CLARK,

*Master Marine Surveyor*

A.C.M.S., U.S.S.A., A.B.Y.C., N.F.P.A.

MMS #80311C

22 Paquin Street, Warren, RI 02885

**401.245.6580**





PRIVILEGED AND CONFIDENTIAL    *www.ACMS-USA.com*

## CONDITION AND VALUE SURVEY

Name of Vessel: **Prim Lady**    Year Built: **1995**    Registration:    Documentation:

Home Port: **Green Harbor, MA**    Use: **Commercial**    Type of Vessel: **42' Provincial (P.E.I.)**

Builder: **Provincial**    Builders Hull No: **817898/MSZMT181G202**

Owner/Buyer: **Blue Water Enterprises, Inc.**    Address: **Blue Water Enterprises, Inc., PO Box 2682, Ocean Bluff, MA 02065**    Phone: **(781) 837-9826**

Date of Survey: **7/13/02**    Survey out of water.    Does owner contemplate Charter: No

LOA: **42'**    LWL: **39.9'**    Beam: **13'**    Draft: **3' 6"**    Gross Tons:    Net Tons: **4.1**    Speed: **20KTS**

Hull Color: **White**    Hull Material: **GRP**

Location of the Survey: **Green Harbor Marina, MA**    Owner/Buyer present at Survey: Yes

Purchase Price:    Present Value: **$122,500.00**    Replacement Cost: **$150,000.00**

| Material | | Condition |
|---|---|---|
| Hull: | Displacement GRP | Good |
| Bottom: | GRP | Good |
| Bulkheads: | GRP | Good |
| Decks: | GRP/Wood | Good |
| Keel: | Composite | Good |
| Bilges: | Clean/Neat | Good |
| Transom: | GRP | Good |
| Fittings: | Assorted Stainless Bronze | Good |
| Fastenings: | Stainless | Good |
| Rub Rails: | Rubber | Good |
| Hatches: | Bowmar 4-25"O.D. and 21" I.D. | Good |
| Deck Hardware: | | |
| Port Holes: | | Good |
| Ventilation: | | |
| Cabin Sole: | GRP/Non-Skid | Good |
| Bimini: | N/A | |
| Upholstery: | N/A | |
| Pulpit: | N/A | |
| Bow Rails: | N/A | |
| Life Lines: | N/A | |
| Faucets: | N/A | |
| Toilets: | N/A | |
| Sinks: | Stainless Steel | Good |
| Showers: | N/A | |

## Machinery Space

Engine Manufacturer: **Ford Mermaid**

No. **11040**    Model: **Mermaid**    Condition: **Good**

Year: **1995**    Type: **Diesel**    Cylinders: 6    HP: **300**

Location: **Amidships**

Engine Hours: (Port)

Engine Controls: **Excellent Condition**

Blowers: N/A

Through-Hulls/Seacocks: **Nylon/Brass**

Bow Thruster: **N/A - Bow Thruster Option Installed**

Shaft Material: **Stainless Steel 2 1/4" O.D.**

Props: **Brass 28" by 26 Pitch Hi-Torque 4 Blade**

Stuffing Box: **Duramax (New)**

*Rudders: **Stainless Steel 2 1/4" O.D. (Rudder Piston New)**

Steering: **Hydraulic**

Bilge Pumps: (2) **Rule 2000 GPH with Auto Switch**

Winch: **12" Hydra Slave Hydraulic Winch In Excellent Condition**

*Notes:*

*See Recommendations.



*Rob Scanlan, Master Marine Surveyor*

CERTIFIED & ACCREDITED - UNITED STATES AND CANADA
P.O. Box 87, Nahant, Massachusetts 01908
781-595-6225 (office)  781-593-2711 (fax)

*Yachts & Ships — Power & Sailing*
*Serving Coastal New England, Cape Cod & the Islands*



www.mastermarinesurveyor.com

ATTACHMENTS
Page ( / ) of ( 9 )

## PRIVILEGED AND CONFIDENTIAL

DAMAGE SURVEY REPORT NUMBER: GALGANA - 02.10.6
PARTY REQUESTING THIS SURVEY: Law Offices of Mason & Duffy, P.C.

OWNER OF VESSEL: Blue Water Enterprises, Inc.
ADDRESS: P.O. Box 2682
CITY: Ocean Bluff        STATE: Massachusetts      ZIP: 02065
PHONE: 781-837-9826      CELL: 781-223-4000

NAME OF VESSEL: PRIM LADY
REGISTRATION/DOCUMENTATION NO: MS 2682 BW (current to 2004).
HOME PORT: Green Harbor, Massachusetts
VESSEL USE: Commercial Fishing.

UNDERWRITER: International Marine Underwriters   POLICY NUMBER: C 5 J H 5 1 3 1 7

DESIGNER/BUILDER: Provincial Boat and Marine Ltd.
BUILDERS HULL NUMBER: 8 1 7 8 9 8 (Canada).
COMMONWEALTH OF MASSACHUSETTS HULL NUMBER: M S Z M T 1 8 1 G 2 0 2

HULL MATERIAL: Fiberglass.
HULL COLORS: White hull & superstructure; blue cove; red boot stripe and blue bottom.
MODEL: 42' PROVINCIAL CUSTOM
LOA: 42' 0"   LWL: 39' 6"   BEAM: 13' 0"   DRAFT: 3' 6"
SPEED: 18-20 knots estimated.   GROSS TONS: 16,000 LBS.   NET TONS: 8,100 LBS.

## MAIN ENGINE

ENGINE MANUFACTURER/MODEL: Mermaid Marine MONARCH  DM177/4
ENGINE HOURS ▮▮▮▮▮▮ ░  SERIAL NUMBER: 1 1 0 4 0      YEAR: 1995
TYPE: Diesel        CYLINDERS: In-Line (6)        HORSEPOWER: 300
MAINTENANCE LOG/OVERHAUL: Receipts and maintenance logs reported for an on-going
and dedicated maintenance program prior to the loss.

DATE OF LAST SURVEY: 13 July 2002
DATE OF THIS SURVEY: 6 October 2002    DATE OF THIS REPORT: 12 November 2002
SURVEY LOCATION: Green Harbor Marine in Massachusetts.
PERSON(S) ASSISTING SURVEYOR: The attending surveyor only.

INSURED VALUE: $122,000.00      REPLACEMENT VALUE: $125,000.00